✓ FILED ___ ENTERED
___ LOGGED ____ RECEIVED

Sep 21, 2022

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ MD ___ Deputy

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF** | |
| **AN APPLE IPHONE, SERIAL NUMBER HDFYD0JJW4; AND** | **CASE NO.** 22-mj-2517-TJS |
| **A BLUE IN-COLOR FLIP-STYLE CELLULAR PHONE** | **CASE NO.** 22-mj-2518-TJS |
| **IN THE CUSTODY OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES** | |

<u>**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**</u>

I, Katherine M. Benedict, Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), having been duly sworn, state as follows:

<u>**Introduction**</u>

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41, which seeks authorization to forensically search the following devices (collectively, the "**TARGET DEVICES**") as described herein and in Attachments A-1 and A-2 for evidence described in Attachment B:

a.      Apple iPhone, serial number HDFYD0JJW4 labeled ATF Exhibit 006 (**"TARGET CELLULAR DEVICE 1"**)

b.      Blue in color flip-style cellular phone labeled ATF Exhibit 008 ("**TARGET CELLULAR DEVICE 2**")

The **TARGET DEVICES** are currently in the custody of the ATF located at a facility in Prince George's County, Maryland, associated with ATF Case No. 761050-22-0036.

2.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of

1

my knowledge about this matter. Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation.

3. Wherever in this affidavit I discuss information resulting from physical surveillance, that information (except where otherwise indicated) does not set forth my own personal observations, but rather has been provided directly or indirectly through other law enforcement officers who conducted such surveillance.

4. Unless otherwise provided, wherever in this affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

5. Based on my training, experience, and the facts in this affidavit, there is probable cause to believe that:

    a. **DERRELL LAMONT GARRISON ("GARRISON")** and his co-conspirators have committed violations of 21 U.S.C. § 841 (distribution and possession with intent to distribute a controlled substance) (the "Target Offense").

    b. Records and information associated with the **TARGET DEVICES** will contain evidence, fruits, and/or instrumentalities of the Target Offense.

### Agent Background

6. I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7), that is, I am a Special Agent of the ATF empowered by law to conduct investigations of, and to make arrests for, violations of federal criminal law.

7. I have been a Special Agent with the ATF since August 2001. During my tenure as a Special Agent with ATF, I have attended the United States Treasury Department's Criminal Investigators Training Program and ATF's New Professional Training, both conducted at the Federal

Law Enforcement Training Center located in Glynco, Georgia. I have received extensive training, both formal and on-the-job, in the provisions of the Gun Control Act, the National Firearms Act and the Controlled Substances Act. I have prepared and participated in search and seizure warrants involving these laws and participated in the investigation, arrest and prosecution of hundreds of individuals for firearms and narcotics violations.

8.      I have been involved in Organized Crime Drug Enforcement Task Force ("OCDETF") investigations involving armed drug trafficking organizations, as well as participated in Title III wiretap investigations involving federal firearms and narcotics violations.

9.      As a result of my experiences, I have become familiar with the patterns of activity of drug traffickers, the methods, language and terms that are used to disguise the source and nature of the profits of illegal drug distribution activities. Additionally, during a previous assignment at the ATF Internet Investigations Center, I received specialized training in social media exploitation, dark web investigations and opensource intelligence, and participated in cybercrime investigations involving firearms and narcotics.

10.     Additionally, based on my training, experience, and participation in other narcotics investigations, I know the following to be true:

    a.      that it is common for drug dealers to "front," or provide on consignment, controlled substances to their customers;

    b.      that it is common for drug dealers to conceal contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, vehicles and/or businesses for ready access;

    c.      that it is common for drug dealers to conceal proceeds from law enforcement authorities and rival narcotics traffickers;

    d.      that drug dealers routinely use cellular telephones to facilitate their drug distribution operations;

e.   that drug dealing is an ongoing process that requires the development, use, and protection of a communication network to facilitate daily drug distribution;

f.   that drug dealers use telephones to thwart law enforcement efforts to penetrate the drug dealers' communication networks;

g.   that drug dealers commonly bring their phones with them while engaging in drug trafficking, as they can use the phone to communicate with confederates in furtherance of their activities (e.g., communicating surveillance information about potential law enforcement; communicating changes in meeting times/places, etc.); and

h.   that drug traffickers commonly use "coded" language when speaking with other drug traffickers in order to thwart detection by law enforcement agents who may be intercepting their communications.

11.   Based on my training, experience, knowledge, and participation in narcotics and firearms investigations, and the training and experience of other agents and detectives with whom I am working in this investigation, I also know that:

a.   Those who distribute and conspire to distribute controlled substances ("drug traffickers") maintain records electronically and in hard copy—including ledger books, records, receipts, notes, bank and credit card records, money orders, cashier's checks, bus and plane tickets, records indicating the existence of a storage facility, and other records—relating to the importation, manufacture, transport, ordering, sale, and distribution of controlled substances. Those records are commonly maintained in secure locations to which drug traffickers have ready access, such as locations within (i) their residences (including curtilage), (ii) the residences of trusted associates (including family members, friends, and coconspirators), (iii) the places of operation of their drug distribution activities (such as "stash houses" or "safe houses"), (iv) business locations with which the trafficker or their close associates are affiliated, (v) their vehicles, (vi) other similarly secure storage areas ("secured locations"), and (vii) data storage devices that can store digital photographs, drug ledgers, cryptocurrency addresses, and locations of secured locations, among other items and records related to drug trafficking. Drug traffickers often maintain such evidence for long periods of time.

b.   Drug traffickers routinely conceal in secured locations the proceeds of their drug transactions, including large quantities of currency, financial instruments, precious metals, jewelry, and other items of value tied to or purchased with such proceeds. Drug traffickers often launder their drug proceeds to disguise the nature and source of those proceeds and to promote their drug trafficking activities.

c.   Drug traffickers often maintain contraband and instrumentalities related to the activity at secured locations, such as cell phones, firearms and other weapons, ammunition, scales, razors, packaging materials, cutting agents, cooking utensils, blenders, filtration masks, and containers for preparing and storing controlled substances for

distribution. Drug traffickers often maintain multiple cell phones, firearms, and other instrumentalities of drug trafficking in secured locations.

d.   Drug traffickers commonly maintain at secured locations contact information and address books electronically and in hardcopy that reflect names, addresses, and telephone numbers for associates in their illegal organization. As described below, such individuals often utilize cellular telephones, computers, and telephone systems to maintain contact with their associates in their illegal businesses.

e.   Drug traffickers often take photographs of themselves, their associates, their property, and illegal contraband. Such photographs are usually maintained in one or more secured locations, including on cell phones, digital cameras, or computers found within such locations.

f.   Drug traffickers often use their vehicles to meet with suppliers and coconspirators, sell to drug buyers, travel to stash houses, transport drugs and drug proceeds, conduct counter-surveillance, and maintain instrumentalities of drug trafficking (including firearms, ammunition, and digital scales). The location information associated with a drug trafficker's vehicle assists law enforcement with identifying the drug trafficker's residence, identity, buyers, coconspirators, suppliers, stash houses, meeting locations, and the financial institutions where the drug trafficker launders proceeds.

12.   I also know that drug traffickers use cell phones in furtherance of drug trafficking, and that the location data associated with those cell phones normally constitutes evidence and leads to evidence of drug trafficking. In particular, I know that:

a.   Drug traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be subject to physical surveillance by law enforcement authorities. Narcotics traffickers rarely refer to heroin, cocaine, cocaine base (also known as "crack"), phencyclidine ("PCP"), or other illegal drugs expressly by name. Instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, narcotics traffickers routinely refer to drugs, drug quantities, and drug prices by using seemingly innocuous words or phrases. I have become familiar the methods, language, and terms that narcotics traffickers use to disguise conversations about their narcotics activities.

b.   Drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones, all in an effort to avoid detection and to impede law enforcement efforts. Drug traffickers also

communicate by use of text messaging to discuss types, quantities, and prices of narcotics, as well as to discuss meeting locations, all in an effort to elude detection and to impede the efforts of law enforcement. Drug dealing is an ongoing process that requires the development, use, and protection of a communications network to facilitate daily narcotics distribution.

c.     To that end, drug traffickers use communication facilities (including cell phones) to further every aspect of the drug trade. Drug traffickers use communication facilities to contact—by way of both voice call and electronic message—drug suppliers, customers, and coconspirators, all for the purpose of acquiring, storing, transporting, and distributing drugs. Drug traffickers also maintain, on their cell phones, records related to drug distribution (e.g., ledgers and notes pertaining to drug sales), and photographs of drugs, drug paraphernalia, the instruments of the drug trade (including firearms), and records and receipts regarding the proceeds of drug distribution as well as the disposal, transfer, or expenditure of such monies. Drug traffickers often maintain such evidence on their cell phones for long periods of time. Further, the location data associated with a drug trafficker's cell phones assists investigators in identifying the drug trafficker's residence, stash house, coconspirators, the residences of the trafficker's coconspirators, and meeting locations.

**Probable Cause**

13.     On June 16, 2022, a federal Grand Jury in the United States District Court of Maryland returned a three-count indictment charging **GARRISON** with felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). The criminal case number is DLB-22-CR-215. United States Magistrate Judge Gina L. Simms issued an arrest warrant for **GARRISON** on the indictment.

14.     A brief summary of the facts underlying criminal case number DLB-22-CR-215 is as follows: on February 8, 2022, Prince George's County police made contact with **GARRISON** while he was sitting in his vehicle at a liquor store parking lot in Suitland, Maryland. Investigation led to a probable cause search of **GARRISON's** vehicle that resulted in the recovery of cocaine hydrocholoride, crack cocaine, fentanyl and a flip-style cellular phone. Officers recovered from **GARRISON's** person a stolen firearm and an iPhone. Search Warrant 22-mj-972-CBD was issued

by the Honorable United States District Court Magistrate Judge Charles B. Day on April 1, 2022 for the recovered phones. Digital forensic extractions have been completed and the contents are currently being analyzed.

15.     I learned that **GARRISON** was to appear in traffic court on an unrelated matter in Charles County, Maryland, on August 11, 2022. An arrest operation was planned to execute the aforementioned arrest warrant for **GARRISON**.

16.     On August 11, 2022, special agents from the ATF and officers from the Charles County Sheriff's Office ("CCSO") established surveillance at the Charles County Court Complex located at 11 Washington Avenue, La Plata, Charles County, Maryland. At approximately 1255 hours, officers observed **GARRISON** exit a white BMW 430i sedan bearing Maryland registration 1DR7713 and walk into the courthouse. **GARRISON** was the driver and sole occupant of the vehicle. **GARRISON** later exited the courthouse and was taken into custody by ATF agents and CCSO officers pursuant to the arrest warrant in case number DLB-22-CR-215. A search of **GARRISON**'s person incident to his arrest resulted in the recovery of the keys to the white BMW, $2,340.00 in U.S. Currency, and an Apple iPhone (**TARGET CELLULAR DEVICE 1**).

17.     On this same date, CCSO K-9 Handler PFC Fromme conducted a narcotics scan of the white BMW sedan bearing Maryland registration 1DR7713 using his certified controlled dangerous substance odor detecting canine, resulting in a positive indication for the presence of narcotics. The vehicle was towed to a CCSO security facility for storage pending issuance of a search warrant.

18.     On August 12, 2022, the Honorable Judge West issued search and seizure warrant number SO-22-0649 in the Circuit Court of Maryland for Charles County for the vehicle described as a "white BMW passenger car bearing Maryland registration 1DR7713."

19.     On August 12, 2022, at approximately 1259 hours, CCSO officers executed the search warrant on the BMW. Recovered from the center console was a plastic bag containing three separate twisted sandwich bags. One bag contained approximately 7 grams of suspected cocaine hydrochloride. Another bag contained approximately 2 grams of suspected crack cocaine. The third bag contained approximately 5 grams of suspected heroin and/or fentanyl. Recovered next to the suspected narcotics was a working digital scale. Located in the cup holder in front of the center console was a blue flip-style cellular phone (**TARGET CELLULAR DEVICE 2**).

### Investigation into GARRISON's History

20.     I conducted a background investigation regarding **GARRISON**'s criminal history. The investigation revealed that prior to August 11, 2022, **GARRISON** had been convicted of at least the following felony offense which was punishable for a term of imprisonment exceeding one year: Conviction of Possession With Intent to Distribute Cocaine on or about February 13, 2015 in the Circuit Court for Charles County, Maryland.

### Electronic Storage and Forensic Analysis

21.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

22.     There is probable cause to believe that things that were once stored on the **TARGET DEVICES** may still be stored there, for at least the following reasons:

   a.     Based on my knowledge, training, and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device,

the data contained in the file may not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a cell phone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

23. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET DEVICES** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **TARGET DEVICES** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file. Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the device was in use. Device file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited, to computer-assisted scans of the entire medium that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25. *Manner of execution*. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is good cause for the Court to authorize execution of the warrant at any time in the day or night.

## **Conclusion**

26.     Based on the foregoing, I respectfully submit that there is probable cause to believe that

the **TARGET DEVICES** contain evidence, fruits, and/or instrumentalities of the Target Offense.

Therefore, I request the issuance of a search warrant pursuant to Rule 41 of the Federal Rules of

Criminal Procedure.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my
knowledge.

Respectfully submitted,

Katherine M.
Benedict
2022.09.01
16:01:28 -04'00'

Special Agent Katherine M. Benedict
Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF)

Affidavit submitted by email and attested as true and accurate by telephone, consistent with Fed.
R. Crim. P. 4.1 and 41(d)(3) on this  2nd  day of September, 2022.

Honorable Timothy J. Sullivan
United States Magistrate Judge

## <u>ATTACHMENT A-1</u>
## ITEMS TO BE SEARCHED

The device currently in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") located at a facility in Prince George's County, Maryland, and related to ATF Case No. 761050-22-0036:

Apple iPhone, serial number HDFYD0JJW4 labeled ATF Exhibit 006 (**"TARGET CELLULAR DEVICE 1"**)

## ATTACHMENT A-2
## ITEMS TO BE SEARCHED

The device currently in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") located at a facility in Prince George's County, Maryland, and related to ATF Case No. 761050-22-0036:

Blue in color flip-style cellular phone labeled ATF Exhibit 008 ("**TARGET CELLULAR DEVICE 2**")

## ATTACHMENT B
### Particular Things to be Seized

All records contained in the devices described in Attachments A-1 and A-2 (the **TARGET DEVICES**) that relate to violations of 21 U.S.C. § 841 (distribution and possession with intent to distribute a controlled substance), the "Target Offense," including but not limited to:

1. Possession or use of firearms and ammunition, including but not limited to parts, magazines, gun cases; holsters, and receipts;

2. Drug proceeds, including but not limited to U.S. currency, cryptocurrency transactions, jewelry, bank records, checks, credit card bills, account information, and other financial records;

3. Cell phone location data, including but not limited to Global Position System (GPS) data, coordinates, way points, and tracks;

4. Any information involving drug trafficking and other criminal activity, including communications relating to payments, bank accounts, and financial statements;

5. Any information related to customers or co-conspirators (including names, addresses, phone numbers, or any other identifying information);

6. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

7. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information) and materials or items used for the preparation or sale of illegal controlled substances to include but not limited to glass and/or plastic containers, baggies, scales, and vacuum sealers;

8. Schedules or travels, and evidence related to modes of transportation;

9. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses

10. Passwords and encryption keys, and other access information that may be necessary to access the account and other associated accounts; and

11. All images, videos, messages, and communications regarding methods to avoid detection by law enforcement; and

12. Cloud data, backup data, or any other data stored on or uploaded to the **TARGET DEVICES** as a backup for any other device or electronic account (including email, social media, and online communications) relating to the Target Offense.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage (such as flash memory or other media that can store data) and any photographic form.

13. For each of the **TARGET DEVICES:**

    a.    evidence of who used, owned, or controlled the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.    evidence of software that would allow others to control the devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.    evidence of the lack of such malicious software;

    d.    evidence of the attachment to the devices of other storage devices or similar containers for electronic evidence;

    e.    evidence of counter forensic programs (and associated data) that are designed to eliminate data from the devices;

    f.    evidence of the times the devices were used;

    g.    passwords, encryption keys, and other access devices that may be necessary to access the devices;

    h.    documentation and manuals that may be necessary to access the devices or to conduct a forensic examination of the devices;

    i.    contextual information necessary to understand the evidence described in this attachment.

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

1. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

2. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

3. "scanning" storage areas to discover and possible recover recently deleted files;

4. "scanning" storage areas for deliberately hidden files; or

5. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

6. If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.